## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01406-NYW

JULIENNE SCHAEFFER,

      Plaintiff,

v.

JBS CARRIERS, INC.,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

Magistrate Judge Nina Y. Wang

      This matter comes before the court on the Motion for Summary Judgment (or "Motion") filed by Defendant JBS Carriers, Inc. ("Defendant" or "JBS"). [#53, filed May 7, 2020]. Pursuant to the Order of Reference dated June 7, 2019 [#19], this civil action was assigned to the undersigned Magistrate Judge for all purposes. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. Plaintiff Julienne Schaeffer ("Plaintiff" or "Ms. Schaeffer") has responded to both the Motion and the associated Statement of Undisputed Facts [#59; #63] and Defendant has replied [#61]. This court finds that oral argument will not materially assist in the disposition of the instant Motion. Being fully advised of the premises, this court respectfully **GRANTS IN PART and DENIES IN PART** Defendant's Motion for Summary Judgment.

## BACKGROUND

      On February 21, 2019, Ms. Schaeffer initiated this action against her former employer, JBS, in the District Court for Weld County, Colorado. [#6]. Defendant subsequently removed the action to the District of Colorado on May 16, 2019, pursuant to 28 U.S.C. §§ 1331, 1367, 1441, and 1446. *See* [#1]. Following a Motion to Dismiss filed by JBS [#13, filed May 23, 2019], Ms.

Schaeffer filed an Amended Complaint as a matter of right [#27, filed July 18, 2019], and a Second Amended Complaint on July 31, 2019, *see* [#30], which remains the operative pleading in this action. In the Second Amended Complaint, Ms. Schaeffer asserts eight counts against JBS for sex discrimination and retaliation pursuant to Title VII, 42 U.S.C. §§ 2000e-2, 2000e-3; the Equal Pay Act (or "EPA"), 29 U.S.C. § 206(d); and Colorado's Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. §§ 24-34-401, *et seq.  See generally* [#30].  Specifically, Ms. Schaeffer asserts claims under Title VII for sex discrimination on the bases of wage-discrimination ("Claim I") [*id.* at ¶¶ 78-85] and discriminatory pay practices ("Claim II") [*id.* at ¶¶ 86-92]; under the EPA for unequal pay ("Claim IV") [*id.* at ¶¶ 102-08] and retaliation ("Claim V") [*id.* at ¶¶ 109-116]; pursuant to CADA for sex discrimination on the bases of wage-discrimination ("Claim VI") [*id.* at ¶¶ 117-23] and discriminatory pay practices ("Claim VII") [*id.* at ¶¶ 124-31]; and for unlawful retaliation pursuant to Title VII ("Claim III") [*id.* at ¶¶ 93-101] and CADA ("Claim VIII") [*id.* at ¶¶ 132-40].

Defendant filed its Amended Answer and Counterclaims on January 3, 2020. [#43]. Defendant alleges that Plaintiff impermissibly forwarded sensitive employee information from her work email to her personal email in contravention of JBS's Employee Handbook on at least 185 occasions [*id.* at 21-29], and asserts three counterclaims against Plaintiff: (1) conversion [*id.* at ¶¶ 33-41]; (2) civil theft [*id.* at ¶¶ 42-53]; and (3) breach of contract [*id.* at ¶¶ 54-62].

The Parties proceeded through discovery and, on May 7, 2020, JBS filed the instant Motion for Summary Judgment.  *See* [#53].  In moving for summary judgment in its favor on all eight of Plaintiff's claims, JBS contends that Plaintiff "has no competent evidence supporting even a *prima facie* case under any of her eight legal theories."  [*Id.* at 1].  Ms. Schaeffer disagrees, arguing that genuine disputes of material fact remain and warrant a trial on all eight of her claims.  [#59].  JBS also asserts that there are no genuine disputes of material fact as to its three counterclaims and it

is entitled to judgment as a matter of law. [#53 at 1, 23–25].  Ms. Schaeffer counters that JBS has failed to meet its burden and genuine issues of material fact preclude summary judgment. [#59 at 12–15].

## LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).  "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or, conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson,* 477 U.S. at 248–49.  *See also Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.,* 812 F.2d 621, 623 (10th Cir. 1987).  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party.  *Anderson,* 477 U.S. at 248.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In reviewing a motion for summary judgment, the court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1213 (10th

Cir. 2002).  However, the nonmovant "may not rest upon mere allegation or denials of [the] pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.  Conclusory statements based merely on speculation, conjecture, or subjective belief are not competent summary judgment evidence.  *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004).  The nonmoving party's evidence must be more than "mere reargument of [its] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright, et al., *Federal Practice and Procedure* § 2738 at 356 (3d ed. 1998). Ultimately, however, the court may not enter summary judgment unless Defendant carries its burden under Rule 56 of the Federal Rules of Civil Procedure.  *See Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002).  *See also* Fed. R. Civ. P. 56(a).

## UNDISPUTED MATERIAL FACTS

The following undisputed material facts are drawn from the record before the court.  In some instances, a party has disputed the proffered material fact, but an examination of the record finds that such dispute is not properly supported by evidence in the record.  Where that is the case, the court has noted the dispute and its analysis.

1.      JBS is a multi-state, regional truckload carrier with several distinct departments to facilitate its trucking operations, [#53 at ¶ 1; #53-16 at ¶¶ 2–3; #63 at ¶ 1], including the Safety Department, which is tasked with ensuring JBS drivers operate in accord with federal and state trucking industry standards; collecting accident information in order to submit insurance claims; and handling workers' compensation claims, [#53 at ¶ 1; #53-16 at ¶ 4; #63 at ¶ 1].

2.      On May 2, 2013, JBS hired Ms. Schaeffer as a Risk Specialist/Safety Coordinator within its Safety Department. [#53 at ¶ 2; #36 at ¶¶ 3–4; #63 at ¶ 2].

3.      Ms. Schaeffer worked in the Safety Department for the duration of her employment

4

with JBS. [#53 at ¶ 2; #53-1 at 204:23–205:11; #63 at ¶ 2].[1]

4.      When Ms. Schaeffer began working at JBS, she was supervised by Linda Lindsey ("Ms. Lindsey"). [#53 at ¶ 6; #53-1 at 204:8–15; #53-16 at ¶ 6; #63 at ¶ 6].

5.      Ms. Lindsey reported to Randy Kopecky ("Mr. Kopecky"), the Safety Director hired concurrently with Ms. Lindsey and Dan Wiita ("Mr. Wiita"), another Safety Department employee.  [#53 at ¶ 7; #53-1 at 90:10–92:1, 213:4–16; #63 at ¶ 7].

6.      After Mr. Kopecky terminated his employment as Safety Director in November 2013, Ms. Lindsey temporarily assumed many Safety Director duties. [#53 at ¶ 8; #53-1 at 216:12–15, 223:17–224:7; #53-5 at ¶ 21; #63 at ¶ 8].

7.      As a result, Ms. Lindsey began training Ms. Schaeffer on procedures for filing workers' compensation claims, which had previously been among Ms. Lindsey's duties. [#53 at ¶ 8; #53-1 at 223:17–224:7; #53-5 at ¶ 21; #63 at ¶ 8].  Ms. Schaeffer began performing some of Ms. Lindsey's former duties. [#59 at ¶ 5; #59-3 at 223:17–224:23; #61 at ¶ 9].

8.      In January 2014, Ms. Lindsey resigned from her position with JBS. [#53 at ¶ 9; #53-1 at 225:25–226:1; #63 at ¶ 9]. At the time of her resignation, Ms. Lindsey was making $59,999.68 per year. [#53 at ¶ 9; #53-16 at ¶ 7; #63 at ¶ 9].

9.      Ms. Schaeffer assumed all of Ms. Lindsey's duties, in addition to performing her own duties, after Ms. Lindsey left JBS. [#59 at ¶ 6; #59-3 at 224:8–23; #61 at ¶ 9].

10.     In March 2014, Mark Respass ("Mr. Respass") was hired as Safety Director, thereby becoming Ms. Schaeffer's supervisor. [#53 at ¶ 10; #53-1 at 89:4–5, 216:18–22, 223:17–

[1] When citing to the Electronic Court Filing ("ECF") system, the court generally uses the convention [#___] to refer to the docket and page number assigned by the ECF system.  However, when citing to transcripts, this court refers to the ECF number for the document, but the page and line numbers from the original transcript for purposes of consistency and clarity.

25; #61 at ¶ 10].

11.     In June 2014, Mr. Respass promoted Ms. Schaeffer. [#53 at ¶ 11; #53-6 at ¶¶ 5–8; #53-7].

12.     Ms. Schaeffer was told that she was taking Ms. Lindsey's former role. [#59 at ¶ 10; #59-1 at ¶ 1; #61 at ¶ 10].

13.     Ms. Schaeffer's promotion included a pay increase from her initial salary of $26,000 to $35,000 per year. [#53 at ¶ 12; #53-7; #63 at ¶ 12].

14.     Mr. Respass set Ms. Schaeffer's salary, the amount of which was based on funds available in the Safety Department budget and Mr. Respass's desire to reward Ms. Schaeffer's "excellent work." [#61 at ¶ 16; #53-6 at ¶ 19].

15.     All positions at JBS, including the Safety Assistant Manager position, have a presumptive minimum and maximum pay range assigned to the position; these pay ranges are set based on a variety of factors, including the types of duties associated with the position, the responsibilities associated with the position, and the market demand for the position. [#53 at ¶ 13; #53-6 at ¶ 7; #53-16 at ¶ 8; #63 at ¶ 13].[2]

16.     Because of the "substantial increase" between Ms. Schaeffer's starting salary and her salary increase upon promotion, JBS determined that it could not "bring her to the minimum salary [associated with the position] due to the gap in between [her initial salary and the minimum salary]." [#53 at ¶ 12; #53-7; #63 at ¶ 12].

_____

[2] Ms. Schaeffer denies this fact by citing to her Personnel Change Form [#63-1] and arguing that her "pay was set because of the 'gap' between her starting pay and the minimum salary." [#63 at ¶ 13].  While the Parties do not appear to dispute that Ms. Schaeffer's salary upon promotion was adjusted because of a "gap," *see infra* [Undisputed Material Facts ("UMF") ¶ 16], this does not create a genuine dispute of fact as to whether JBS sets its *presumptive pay ranges* based on a variety of factors.

17.     The Personnel Change Form related to Ms. Schaeffer's 2014 promotion states that her salary was lower than the presumptive minimum for her position due to the "substantial increase" between her starting salary and the presumptive minimum and JBS "cannot bring her to the minimum due to the gap in between" her starting salary and the presumptive minimum. [#59 at ¶ 18; #61 at ¶ 18; #63 at ¶¶ 13, 14; #63-1].

18.     The JBS job description for its Safety Assistant Manager position fails to reflect the job duties that Ms. Schaeffer and Ms. Lindsey assumed in the Safety Department. [#59 at ¶ 35; #59-1 at ¶ 22; #61 at ¶ 35].

19.     Following Ms. Schaeffer's promotion in June 2014, her job duties remained the same until her employment was terminated. [#53 at ¶ 15; #53-1 at 233:23–234:20; #53-5 at ¶ 21; #63 at ¶ 15].

20.     Ms. Schaeffer used "Risk Manager" as the title in her email signature from June 2014 through approximately July 2017.  [#59 at ¶ 11; #59-1 at ¶ 3; #59-6 at 3; #61 at ¶ 11].

21.     Ms. Schaeffer was introduced to all team members, other office employees, and JBS drivers as the Risk Manager and was listed as the Risk Manager on a phone list and company-wide Outlook contact list. [#59 at ¶ 12; #59-1 at ¶ 4; #59-7 at 1, 5; #61 at ¶ 12].

22.     Mr. Respass told Ms. Schaeffer that Ms. Lindsey was paid significantly more than her for the same duties, but that his hands were tied and he could not pay Ms. Schaeffer any more than she was already being paid. [#59 at ¶¶ 13, 14; #59-1 at ¶¶ 5, 6; #61 at ¶¶ 13, 14].

23.     Ms. Schaeffer's primary job responsibility involved assisting insurance adjusters for either workers' compensation or property and casualty insurance claims. [#53 at ¶ 16; #53-1 at 424:7–17; #63 at ¶ 16].  This responsibility constituted between 60 and 75 percent of her working time. [#53 at ¶ 16; #53-1 at 424:7–17; #63 at ¶ 16].

24.     The remaining 30 to 40 percent of Ms. Schaeffer's working hours were spent on accident reporting duties for purposes of insurance claims, including keeping accident statistics and information related to accidents. [#53 at ¶ 17; #53-1 at 407:16–409:8, 424:3–6; #63 at ¶ 17].

25.     Ms. Schaeffer was eligible for and received merit-based increases and bonuses during her employment with JBS. [#59 at ¶ 17; #59-8; #59-9 at 1; #61 at ¶ 17].

26.     In December 2016, Mr. Respass was terminated as Safety Director and replaced by Michael Job ("Mr. Job"), who became Ms. Schaeffer's direct supervisor. [#53 at ¶ 18; #53-6 at ¶ 20; #53-1 at 189:3–4, 216:18–25, 253:17–255:13; #63 at ¶ 18].

27.     Shortly thereafter, Ms. Schaeffer took medical leave, returning to work on May 31, 2017. [#53 at ¶ 19; #53-9; #63 at ¶ 19].

28.     Upon returning from her medical leave, Ms. Schaeffer was provided with an internal contact list for the Safety Department which incorrectly identified Ms. Schaeffer as a "Risk Specialist." Ms. Schaeffer told Mr. Job that her listed title was incorrect and explained that she was instead the "Risk Manager." [#53 at ¶ 19; #53-9 at 2; #63 at ¶ 19].

29.     On or about June 25, 2017, Mr. Job met with Ms. Schaeffer, providing her with the Personnel Change Form from her 2014 promotion and explaining that her title was "Safety Assistant Manager." [#53 at ¶ 20; #53-5 at ¶ 17; #53-9 at 2; #59 at ¶ 18; #59-1 at ¶ 7].[3]

30.     Ms. Schaeffer was aware of multiple men employed by JBS who had earned promotions with salary increases of $10,000 or more, including Mr. Job. [#59 at ¶ 18; #59-1 at ¶ 7; #61 at ¶ 18].

31.     A few days later, during a second meeting with Mr. Job, Ms. Schaeffer asked why

---

[3] In denying this fact, Ms. Schaeffer states "Plaintiff spent approximately 20 minutes per week on training." [#63 at ¶ 20 (citing [#63-3 at 420:1–6])]. This statement appears inapposite to the factual assertion regarding the June 25, 2017 meeting.

she was not being paid the minimum salary for a Safety Assistant Manager position. [#53 at ¶ 21; #53-5 at ¶ 17; #63 at ¶ 21]. Mr. Job said that he did not know the answer but would look into it, including speaking with Mike McQuade ("Mr. McQuade"), the JBS Human Resources Director. [#53 at ¶ 21; #53-5 at ¶ 17; #63 at ¶ 21; #59 at ¶ 23; #59-1 at ¶ 12; #61 at ¶ 23].

32.     According to Ms. Schaeffer, she then told Mr. Job that she was "aware of several male [employees] that had been promoted and received a raise that placed them in the appropriate pay range." In response, Mr. Job's "demeanor changed," he brought up that she did not seem "happy" at her job, and said he had noticed "a change in her attitude." [#53 at ¶ 22; #53-5 at ¶ 17; #63 at ¶ 22].

33.     Specifically, Mr. Job told Ms. Schaeffer that there were some mornings when, because of her demeanor, he was scared to "even say good morning," and questioned whether Ms. Schaeffer was looking for a new job because he had seen her resume on Indeed.com. [#53 at ¶ 22; #53-5 at ¶ 17; #63 at ¶ 22].

34.     Several weeks after her June 2017 meeting with Mr. Job, Ms. Schaeffer asked Mr. Job about her pay, "following up," but "he got angry with [her], so [she] dropped it." [#53 at ¶ 25; #53-5 at ¶ 16; #63 at ¶ 25].

35.     On September 6, 2017, Ms. Schaeffer met with Mr. McQuade and Mr. Job about a workers' compensation issue. Mr. McQuade decided that JBS should provide a driver with reimbursement for certain expenses, and Ms. Schaeffer disagreed. [#53 at ¶ 26; #53-1 at 303:4–306:3; #63 at ¶ 26; #59 at ¶ 26; #61 at ¶ 26].

36.     Following the September 6, 2017 meeting, Ms. Schaeffer told Mr. Job that she felt like JBS was "setting a bad precedent" by reimbursing the expenses discussed at the meeting, and Mr. Job responded that it was not her decision to make and she needed to "drop it." [#53 at ¶ 26;

#53-1 at 303:4–306:3; #63 at ¶ 26].

37.    On September 7, 2017, Ms. Schaeffer began drafting a resignation letter. [#53 at ¶ 29; #53-10; #53-11; #63 at ¶ 29].

38.    On September 21, 2017, Ms. Schaeffer sent an email to eight recipients, including the president of JBS, concerning the same workers' compensation issue discussed at the September 6, 2017 meeting with Mr. McQuade and Mr. Job. [#53 at ¶ 27; #55; #63 at ¶ 27].

39.    In her email, Ms. Schaeffer expressed her dissatisfaction with Mr. McQuade's decision on the workers' compensation issue. [#53 at ¶ 27; #55; #58; #63 at ¶ 27].

40.    Ms. Schaeffer also explained in her email the JBS workers' compensation policy, why certain payments were not ordinarily paid, and why the recipient employee of the payments was not eligible under the JBS policy, which was her area of expertise. [#59 at ¶ 27; #59-4; #61 at ¶ 27].

41.    Ms. Schaeffer did not believe the email was insubordinate and felt it was professional to include Messrs. McQuade and Job as recipients so that her email would not be construed as "going behind their backs." [#59 at ¶ 28; #59-1 at ¶ 23; #61 at ¶ 28].

42.    Ms. Schaeffer did, however, predict that Mr. Job would " again, call [her] in and say, don't do that." [#53 at ¶ 28; #53-1 at 316:1–7].

43.    Shortly after sending the workers' compensation issue email, in another email to a colleague from a different JBS department, Ms. Schaeffer wrote, "I will probably get in trouble for that [workers' compensation issue] email (just in case…it's been nice working with you! 😊), . . ." [#53 at ¶ 28; #55; #63 at ¶ 28].

44.    Later in the day, Ms. Schaeffer modified her draft resignation letter.   The resignation letter said "[i]t has been a pleasure working with [Mr. Job] and the team," and made

no mention of alleged pay disparities or hostility. [#53 at ¶ 29; #53-10; #53-11; #63 at ¶ 29].

45.   On September 26, 2017, Mr. Job met with Ms. Schaeffer to present her with a Final Written Warning.  [#53 at ¶ 30; #53-12; #53-1 at 279:9–14, 316:8–10; #63 at ¶ 30].  The Final Written Warning cited both the September 6 meeting and September 21 email as examples of Ms. Schaeffer's unprofessional attitude and behavior. [#53 at ¶ 30; #53-12; #63 at ¶ 30].

46.   During this meeting, after she was presented with the Final Written Warning, Ms. Schaeffer "refused to sign it because [she] wanted him to back up his statements with facts about what [she] was wrong about," and when Mr. Job said he was not going to argue with her, "mouthed off and said that it was all bullsh[**] and he and McQuade . . . were just pissed because the money they paid the guy had not been approved by [JBS's President] . . . and now [JBS's President] knew about it." [#53 at ¶ 31; #53-8 at 2; #63 at ¶ 31; #63-4].

47.   Mr. Job told Ms. Schaeffer that he could not continue her employment if she continued to argue with him and, in response, Ms. Schaeffer "tuned him out, looked at him and said . . . 'Fine, I'm done!!!' [and] walked out . . . ." [#53 at ¶ 31; #53-8 at 2–3; #63 at ¶ 31].

48.   At or around this time, Ms. Schaeffer told multiple people that she was terminated as a result of the situation related to the workers' compensation issue. [#53 at ¶ 32; #53-8; #63 at ¶ 32].

49.   A JBS Human Resources employee, Tina Rockwell ("Ms. Rockwell"), subsequently informed Ms. Schaeffer that her employment had been involuntarily terminated. [#59 at ¶ 30; #59-1 at ¶ 16; #61 at ¶ 16].  JBS confirmed that Ms. Schaeffer had been terminated in its response to her unemployment claim. [#59 at ¶ 30; #59-1 at ¶ 16; #61 at ¶ 16].

50.   Ms. Schaeffer maintains that she quit her employment because she felt forced to in light of the pay disparity and alleged hostility from Messrs. Job and McQuade. [#53 at ¶ 33; #53-

1 at 166:20–25, 187:20–189:2; #63 at ¶ 33].

51.     Ms. Schaeffer identifies only Mr. Wiita and Vertis Thacker ("Mr. Thacker") as JBS employees with similar job functions to hers, and alleges that she was paid less than both Mr. Wiita and Mr. Thacker.  [#53 at ¶ 34; #53-5 at ¶¶ 18, 19; #63 at ¶ 34].

52.     Ms. Schaeffer, Mr. Wiita, and Mr. Thacker all reported directly to the Safety Director. [#59 at ¶ 22; #59-1 at ¶ 11; #61 at ¶ 22].

53.     During the relevant period, Mr. Wiita and Mr. Thacker were both Training and Development Supervisors (or "Training Managers") in the Safety Department. [#53 at ¶ 35; #53-16 at ¶ 11; #63 at ¶ 35].

54.     According to Ms. Schaeffer, Mr. Wiita's job responsibilities included "training drivers" and running the driver Mentor Program. [#53 at ¶ 36; #53-1 at 384:15–385:16, 218:25–219:17; #63 at ¶ 36].  Mr. Thacker performed the same duties as Mr. Wiita, with the exception of the Mentor Program, from an office in Texas. [#53 at ¶ 36; #53-1 at 331:4–19, 221:4–9, 386:14–23; #63 at ¶ 36].

55.     According to Ms. Schaeffer, she and Mr. Wiita had "very few" duties in common. [#53 at ¶ 37; #53-1 at 385:10–25; #63 at ¶ 37].

56.     Ms. Schaeffer identifies two similar job duties shared between she and Mr. Wiita: answering the accident phone and providing some amount of driver training. [#53 at ¶ 37; #53-1 at 385:10–25].

57.     Every employee in the Safety Department was responsible for answering the accident phone, including Ms. Schaeffer who estimates that she spent between 5 and 10 percent of her working hours answering the accident phone. [#53 at ¶ 38; #53-1 at 421:3–22; #53-5 at ¶ 19; #63 at ¶ 38].

58.     Ms. Schaeffer estimates that she spent only a few minutes each week providing driver training. [#53 at ¶ 39; #53-1 at 420:1–6; #63 at ¶ 39].

59.     Ms. Schaeffer's primary job duty was, and roughly 65 to 70 percent of her working hours were spent on, assisting insurance adjusters, both on work compensation and property and casualty claims, to achieve successful claims management.  No one else at JBS shared these responsibilities with Ms. Schaeffer.  [#53 at ¶ 41; #53-1 at 424:7–17].[4]

60.     Ms. Schaeffer estimated that roughly 30 to 40 percent of her working time was spent on accident reporting for claims purposes. [#53 at ¶ 42; #53-1 at 424:3–6; #63 at ¶ 42].

61.     Neither Mr. Wiita nor Mr. Thacker had duties dealing with accident reporting for insurance claims purposes. [#53 at ¶ 42; #53-1 at 385:3–9; #53-16 at ¶ 12].[5]

---

[4] Plaintiff challenges this fact, arguing that "Mr. Wiita also had accident reporting duties," [#63 at ¶ 41], and citing to Plaintiff's affidavit as support, [*id.* (citing [#63-1 at ¶ 8])].  Plaintiff's averments related to Mr. Wiita's job duties are insufficient evidence for purposes of summary judgment. Even construing her statement in the light most favorable to her, Ms. Schaeffer's unsupported assertion does not create a genuine issue of material fact.  At summary judgment, the non-movant must come forward with specific facts, supported by admissible evidence, to demonstrate a disputed material fact and cannot simply rely on denials. Fed. R. Civ. P. 56(e) ("If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for the purposes of the motion."). Conclusory statements or those based on speculation, conjecture, or surmise provide no probative value on summary judgment, *see Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990); nor may the nonmovant rely on "mere reargument of his case or a denial of an opponent's allegation," *see* 10B Charles Alan Wright, et al., *Federal Practice and Procedure* § 2738 at 356 (3d ed. 1998).  And, even assuming that Mr. Wiita had accident reporting duties, to the extent Plaintiff asserts that this properly establishes that Mr. Wiita shared in insurance claims management duties with Plaintiff, Defendant points out that her assertion is belied by her deposition testimony. *See* [#53-1 at 424:7–17 (Q: "What was your primary job duty?" A: "I would say my primary job duty was assisting the insurance adjusters, both on work comp and property and casualty, to have successful claims management." . . . Q: "Did anybody else at JBS Carriers have that same job responsibility while you were there?" A: "No.")].

[5] Plaintiff challenges this fact by arguing that "Mr. Wiita also had accident reporting duties," [#63 at ¶ 42], and citing to Plaintiff's affidavit as support, [*id.* (citing [#63-1 at ¶ 8])]. Here again, to the extent she claims that Mr. Wiita had accident reporting duties *for insurance claims purposes*, Plaintiff's position is contradicted by her deposition testimony. *See* [#53-1 at 385:3–9 (Q: "Did

62.     Ms. Schaeffer arranged light duty work for injured drivers and submitted their timesheets to payroll while on light duty. [#59 at ¶ 21; #61 at ¶ 21].

63.     In 2015, Mr. Wiita told Ms. Schaeffer that he made over $50,000. [#59 at ¶ 15; #59-3 at 78:24–80:19; #61 at ¶ 15].

64.     Ms. Schaeffer alleges that five individuals were promoted and received "substantial" pay raises despite significant gaps in pay between their pre-promotion and post-promotion salaries: Randy Elam, Robert Standen, Mr. Job, Jonathan Cribbs, and George Silvas. [#53 at ¶ 43; #53-1 at 82:7–88:16, 413:13–414:17; #63 at ¶ 43].

65.     None of the five individuals identified by Ms. Schaeffer were promoted in 2014 or by Mr. Respass, and only Mr. Job worked in the Safety Department before or after promotion. [#53 at ¶ 44; #53-16 at ¶¶ 13–18; #63 at ¶ 44].

## PLAINTIFF'S CLAIMS AGAINST JBS

This court now turns to each of Plaintiff's eight claims against JBS to determine whether summary judgment is warranted. First, I consider Plaintiff's pay discrimination claim under the Equal Pay Act (Claim IV). Second, I consider Plaintiff's sex discrimination claims on the bases of wage disparities (Claims I and VI) and pay practices (Claims II and VII), respectively. Third and finally, I consider Plaintiff's retaliation claims under Title VII (Claim III), the EPA (Claim V), and CADA (Claim VIII).

---

Mr. Wiita spend any time processing workers' compensation claims?" A: "No." Q: "Did he spend any time processing or submitting insurance claims?" A: "No, he did not process or submit insurance claims.")]. This is insufficient for the same reasons set forth above. *See supra* note 4. Plaintiff also contends that she had the same amount and frequency of interface with drivers as did Messrs. Wiita and Thacker. [#59 at ¶ 20 (citing [#59-1 at ¶ 9])]. But Plaintiff cites only her own affidavit to support this assertion, which Defendant contends is "actually a legal conclusion." [#61 at ¶ 20]. *See Pasternak v. Lear Petroleum Expl., Inc.*, 790 F.2d 828, 834 (10th Cir. 1986) ("Conclusory allegations, general denials, or mere argument of an opposing party's case cannot be utilized to avoid summary judgment.").

I.      **Pay Discrimination Under the Equal Pay Act.**

To establish a prima facie case under the Equal Pay Act, a plaintiff must provide admissible evidence demonstrating that: (1) she was performing work which was substantially equal to that of the male employees she has identified considering the skills, duties, supervision, effort, and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; and (3) the male employees were paid more under the same circumstances. *Riser v. QEP Energy*, 776 F.3d 1191, 1200 (10th Cir. 2015). Work is "substantially equal" under the Equal Pay Act if it requires "equal skill, effort, and responsibility." 29 U.S.C. § 206(d)(1). Because this court finds this first element dispositive, it focuses on the same in its analysis of Plaintiff's claim.

Defendant argues that Plaintiff cannot establish that she performed substantially equal work to either of her two alleged comparators. [#53 at 11–12]. Plaintiff counters that the work she performed at JBS was substantially equal to the work performed by Mr. Wiita and Mr. Thacker, and contends that "[w]hether work is substantially equal when different amounts of time are spent on the same duties is a 'question for the trier of fact.'" [#59 at 6–7 (citing *Riser*, 776 F.3d at 1197)]. Both Parties focus on the comparison between Mr. Wiita's job and Plaintiff's job rather than on the similarities between Mr. Thacker's job and Plaintiff's job. *See, e.g.*, [#53 at 13–14]. Because Mr. Thacker's job is more clearly distinguishable from Plaintiff's (e.g., he works in Texas, not Colorado), and otherwise overlaps with Mr. Wiita's duties (with the exception of the driver Mentor Program), the court does the same.

Based on the record before it, this court finds as follows. Mr. Wiita's job responsibilities included driver training and running the driver Mentor Program, and that Mr. Thacker performed the same duties as Mr. Wiita, with the exception of the driver Mentor Program, from an office in Texas. [Undisputed Material Facts ("UMF") ¶ 54]. Ms. Schaeffer's primary job responsibility

involved assisting insurance adjusters for either workers' compensation or property and casualty insurance claims. [*Id.* at ¶ 59]. This responsibility constituted between 60 and 75 percent of her working hours, and no one else at JBS shared these duties. [*Id.* at ¶¶ 23, 59]. The remaining 30 to 40 percent of Ms. Schaeffer's working hours were spent on accident reporting duties for insurance claims purposes. [*Id.* at ¶¶ 24, 60]. Neither Mr. Wiita nor Mr. Thacker had duties related to accident reporting for insurance claims purposes. [*Id.* at ¶ 61].

> In response to the Motion for Summary Judgment, Ms. Schaeffer argues that
>
> [i]t is not accurate that Dan Wiita and Vertis Thacker had no duties related to insurance claims. They had reporting and training responsibilities related to accidents, and would help with investigation. Dan often provided written explanations of DOT regulations and explanations of tractor/trailer maneuvering issues when warranted to assist with claims defense.

[#63-1 at ¶ 8]. But her assertion is contradicted by her deposition testimony. *See* [#53-1 at 385:10–25 (Q: "How were [Mr. Wiita's] job duties similar to yours?" A: " . . . He was responsible for training the drivers and my responsibility was basically, I guess, handling when those drivers didn't follow all the rules or, you know, had accidents or injuries. As far as specific duties, we had very few of those. We both took home the accident phone. We shared in that. . . . But as far as our specific duties other than the accident phone, we did do separate . . . duties[.]")]. Witnesses are generally not permitted to contradict their previous, clear sworn testimony without explanation. *See Allen v. Lang*, 736 F. App'x 934, 940 n.3 (10th Cir. 2019) (rejecting the plaintiff's version of events on summary judgment that contradicted the plaintiff's deposition testimony); *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 956 n.3 (10th Cir. 2012) (noting that an affidavit on summary judgment could not create a genuine issue of material fact when, without explanation, it contradicts prior testimony).

Moreover, Ms. Schaeffer expressly concedes that she and Mr. Wiita had "very few" duties in common. [UMF ¶ 55]. Indeed, she was able to identify only two duties she shared with him.

[*Id.* at ¶ 56]. The first common duty was answering the accident phone, a duty shared by all employees in the Safety Department. [*Id.* at ¶¶ 56, 57]. Ms. Schaeffer estimates she spent between 5 and 10 percent of her working hours answering the accident phone. [*Id.* at ¶ 57]. The second duty identified by Ms. Schaeffer as shared between she and Mr. Wiita was their respective provisions of some amount of driver training. [*Id.* at ¶ 56]. Mr. Wiita was a driver Training Manager and in charge of the driver Mentor Program, whereas Ms. Schaeffer estimated that her driver training duties required a few minutes of her working time each week. [*Id.* at ¶¶ 54, 58].

"The fact that *some* of the work performed by Plaintiff matches the work performed by her male colleagues cannot establish her prima facie case if many features of this work remain substantially different. And significant features of the jobs Mr. [Wiita] and Mr. [Thacker] performed were substantially different than the job Plaintiff performed." *Talbott v. Pub. Serv. Co. of New Mexico*, Civ. No. 18-1102 SCY/LF, 2020 WL 2043481, at *9 (D.N.M. Apr. 28, 2020) (emphasis in original). *See also Fletcher v. Babbitt*, No. 99-cv-0065 MV/RLP, 2000 WL 36739891, at *5 (D.N.M. Apr. 5, 2000) (finding that the two positions did not constitute substantially equal work because, among other reasons, though the plaintiff and her male counterpart each performed similar cleanup duties, "such cleanup duties consisted of only 5-20 percent of [the male]'s work" and the male "spent roughly 50% of his time on projects unrelated to the work [the] [p]laintiff was performing in her own job"); *Ferroni v. Teamsters, Chauffers & Warehousemen Local No. 222*, 297 F.3d 1146, 1149 (10th Cir. 2002) ("It is not sufficient that some aspects of the two jobs were the same."); *Keller v. Crown Cork & Seal USA, Inc.*, 491 F. App'x 908, 910–12 (10th Cir. 2012) ("[D]ifferent pay for 'like' or 'comparable' work does not establish an EPA violation."). Plaintiff testified that the bulk of her working hours and responsibilities were spent performing duties shared with no other JBS employee, and that she had

"very few" duties in common with Mr. Wiita (and by extension, Mr. Thacker). [UMF ¶¶ 54–61].

In addition, Plaintiff avers that she and her two male comparators were all at the same level of management (because they indisputably all reported to the Safety Director, *see* [*id.* at ¶ 52]) and tasked with supervisory responsibilities. [#59 at 7]. But "the existence of a common supervisor does not establish that all positions under that supervisor have job responsibilities that are substantially equal." *Talbott*, 2020 WL 2043481, at \*11. And to the extent Plaintiff states in her affidavit that she and her comparators all exercised supervisory responsibilities and had substantially equal responsibilities, these bare legal conclusions do not create a genuine issue of material fact in the absence of substantiating evidence for her conclusions. *See* [#59 at 7; #59-1 at ¶¶ 9–11].

Citing the fact that she arranged light duty work for injured drivers and submitted the drivers' timesheets to payroll while on light duty, Ms. Schaeffer further contends that she exercised supervision responsibilities equal to those exercised by Messrs. Wiita and Thacker. [#59 at ¶ 21; #59-1 at ¶ 10; #59 at 7]. But Ms. Schaeffer testified that she did not contribute to drivers' performance reviews or exercise any hiring/firing authority over drivers, and they continued to report to their normal supervisors—even while on light duty. [#61-1 at 236:20–240:2]. Moreover, Ms. Schaeffer has not offered any competent evidence to support her assertion that Mr. Wiita or Mr. Thacker exercised any supervisory authority at all.

Plaintiff further argues that Defendant has not met its burden for summary judgment because it has failed to present any evidence regarding the amount of time these men spent performing any of their respective duties. [#59 at 6–7]. But because Ms. Schaeffer bears the burden of proof on her prima facie equal pay case at trial, JBS demonstrates an entitlement to summary judgment simply by pointing to the absence of evidence on her claim. *Celotex Corp.*,

477 U.S. at 322–23; *Adler*, 144 F.3d at 671.  While the court must draw all factual inferences in favor of the non-moving party, the court cannot draw inferences in the absence of proffered, admissible facts.  Thus, Ms. Schaeffer has failed to establish the first element of her prima facie claim.

Given the undisputed facts presented, this court concludes that no reasonable jury could find in Plaintiff's favor on her EPA pay disparity claim.  Accordingly, summary judgment is respectfully **GRANTED** in favor of Defendant on Claim IV.  I turn next to consider Plaintiff's discrimination claims pursuant to Title VII and CADA.

## II.      Discrimination Claims Under Title VII and CADA.

Next, this court considers Plaintiff's sex discrimination claims on the basis of wage discrimination (Claims I and VI) separately from her claims on the basis of discriminatory pay practices (Claims II and VII) in light of the different analytical frameworks applicable thereto. The court notes that despite these different standards, Plaintiff responds to Defendant's arguments related to the discrimination claims collectively, *see* [#59 at 9–10], and further notes that Plaintiff's Response omits entirely any meaningful discussion of her demonstration of a prima facie case, *see* [*id*. (other than perfunctory attempts to distinguish two cases cited by Defendant, Plaintiff states without citing to the record only that she "had equal supervisory responsibility and authority, and equal skill, . . . was in her role for three full years, as were her comparators, . . . and she and two of her comparators were in the same department")].

### A.      Wage-Based Sex Discrimination.

***Direct Evidence***. Although Plaintiff does not frame it as direct evidence, this court pauses to consider Ms. Schaeffer's troubling contention that, after confronting Mr. Respass regarding the discrepancy between Mr. Wiita's salary and her own, Mr. Respass told her that it was because

females did not get paid as much.[6] [#59 at ¶ 15 (citing [#59-3 at 81:5–7)]).  "When a plaintiff offers direct evidence of discrimination in a Title VII claim, her claim may move forward without being subjected to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)."  *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013).  Even viewing Ms. Schaeffer's contention in its most favorable light, this court finds that it is not direct evidence of sex discrimination.

Ms. Schaeffer's deposition testimony about Mr. Respass's statement is subtly, but significantly, different than the characterization of it in her Response.  The entire colloquy is as follows:

> Q:  And what did you do after you looked at that report?
>
> A: I believe I talked to Mark [Respass] just informally and said, I can't believe that Dan makes that much more than me. Mark and I -- in fact, I had talked to Mark's wife several times. We had the discussion that -- and Mark agreed, that females just didn't get paid as much, and he made that comment, and there was nothing he could do about it.

[#59-3 at 81:3–12].  In context, it is not clear that Mr. Respass is specifically referring to Ms. Schaeffer and the decision underlying her pay.  Instead, it is undisputed that Mr. Respass set Ms. Schaeffer's salary, <u>which was dictated by budgetary constraints and the minimum ranges associated with positions</u>, and Mr. Respass's desire to reward Ms. Schaeffer's "excellent work." [#61 at ¶ 16; #53-6 at ¶ 19 (emphasis added)].  There is no indication that Mr. Respass declined to increase Ms. Schaeffer's salary to the presumptive minimum salary for a Safety Assistant Manager due to her sex.  Comments in the workplace that reflect bias or, in this case, perceptions of bias,

---

[6] JBS challenges this assertion and provides an affidavit from Mr. Respass, wherein he avers that he "may have had some conversations with Ms. Schaeffer about why her pay was set the way it was," and "explained that her pay was dictated by budgetary constraints and minimum ranges associated with positions," but does "not recall ever speaking with Ms. Schaeffer about women at JBS not getting paid as much as men[.]" [#61 at ¶ 15; #53-6 at ¶ 19].

do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decision-making authority and <u>acted on his or her discriminatory belief</u>. *Tabor*, 703 F.3d at 1216 (citation omitted).  Nor is there any indication that Mr. Respass requested a larger raise for Ms. Schaeffer, or had specific evidence that JBS simply paid women less as a matter of policy or practice.  *See Didier v. Abbott Labs.*, 614 F. App'x 366, 373 (10th Cir. 2015) (observing that discriminatory comments in the workplace can constitute direct evidence of discrimination when they demonstrated an existing policy that itself constituted discrimination).  Thus, even assuming that Ms. Schaeffer's testimony regarding Mr. Respass's comment is admissible, it lacks the context and the clear discriminatory connotation sufficient to constitute direct evidence.  *See id.* at 373. Thus, having satisfied itself that the *McDonnell-Douglas* framework is appropriate, this court proceeds to considering its application here.

*Indirect Evidence*.  Under both Title VII and CADA, an employee may establish a prima facie case of wage-based sex discrimination by demonstrating that she is female and that the job she occupied was "similar to" higher paying jobs occupied by males. *Riser*, 776 F.3d at 1200.  *See also Williams v. Dep't of Pub. Safety*, 369 P.3d 760 (Colo. App. 2015) (explaining that CADA cases "look to Title VII where the relevant CADA language parallels Title VII").  This standard is less stringent than the "substantially equal" requirement of the Equal Pay Act.  *Id.* at 1200.

Defendant argues that Plaintiff fails to establish a prima facie case of wage-based sex discrimination under either Title VII or CADA because she fails to demonstrate that her alleged comparators had jobs "similar to" her own. [#53 at 15–17].  While the standard for Plaintiff's prima facie case for discrimination under Title VII and CADA is less stringent than the EPA's requirement that subject jobs be "substantially equal," even under this lesser standard Plaintiff's prima facie claim fails. Specifically, Plaintiff relies again on bare legal conclusions that she and

her alleged comparators "had equal responsibility and authority, and equal skill." [#59 at 9].

As an initial matter, it is unclear to the court whether Plaintiff asserts only Messrs. Wiita and Thacker as comparators for purposes of her wage-based sex discrimination claims. *Compare* [#30 at ¶¶ 78–85 (referring to "male colleagues" and "various other male employees of JBS, who held similar positions and performed similar work" in setting forth her claim for wage-based sex discrimination)] *with* [UMF ¶ 51]. In the Second Amended Complaint and her deposition, Plaintiff refers to five alleged comparators that received promotions and salary increases despite large "gaps" between their pre- and post-promotion salaries. *See* [#30 at ¶¶ 32–34, 86–92; UMF ¶ 64]. Yet in her Response, Plaintiff also asserts that "two of her comparators were in the same department" as Plaintiff. *See* [#59 at 10]. Of the five alleged "gap" comparators, only Mr. Job worked in the Safety Department. *See* [UMF ¶ 65]. To the extent Plaintiff refers to either or both Messrs. Wiita and Thacker as the two comparators "in the same department," the court finds it appropriate to first consider whether Messrs. Wiita and Thacker had jobs "similar to" Plaintiff's job before turning to the other five alleged comparators.

Even if Plaintiff had sufficiently supported her assertions with evidence to establish that Messrs. Wiita and Thacker shared some common responsibilities with her, the record evidence— indeed, Plaintiff's own testimony—establishes that Ms. Schaeffer's job was not similar to Mr. Wiita's or Mr. Thacker's positions. For example, Plaintiff's primary role at JBS was the management of insurance and workers' compensation claims, and she shared this responsibility with no one. [*Id.* at ¶ 59]. And per her own testimony, Mr. Wiita primarily trained drivers and oversaw the driver Mentor Program. [*Id.* at ¶ 54]. Thus, their respective positions largely "entailed different types of work." *Block v. Kwal-Howells, Inc.*, 92 F. App'x 657, 660 (10th Cir. 2004). Plaintiff argues that her male comparators' jobs are nevertheless similar because some of her duties

overlapped with duties performed by the comparators and they "worked collaboratively." [#59 at 8]. Yet, according to Plaintiff, she and Mr. Wiita had "very few" duties in common. [UMF ¶ 55]. Nor is there any competent evidence as to how the positions were "substantially equal" in the face of a lack of overlapping duties. "Pointing to a few commonalities . . . does not transform an otherwise dissimilar job into a similar one." *Block*, 92 F. App'x at 660. Plaintiff has thus failed to adduce sufficient evidence for a factfinder to conclude that her job managing workers' compensation and insurance claims was similar to the driver training jobs held by Messrs. Wiita and Thacker. I turn now to consider whether Plaintiff has nevertheless established that her job was "similar to" the other alleged comparators.

Plaintiff identifies five male colleagues that were promoted and received substantial pay raises despite similar gaps in their pre- and post-promotion salaries: Randy Elam, Robert Standen, Mr. Job, Jonathan Cribbs, and George Silvas. *See* [UMF ¶ 64]. However, the only commonalities between her alleged comparators and Plaintiff are the fact that they were JBS employees, received promotions sometime between 2013 and 2017, and had gaps between their pre- and post-promotion salaries of more than $10,000. [*Id.* at ¶ 72; #53-1 at 82:7–88:16, 413:13–414:17; #53-6]. Indeed, the only evidence on record related to the individuals Ms. Schaeffer identifies as comparators is her deposition testimony [#53-1 at 82:7–88:16, 413:13–414:17] and Mr. Respass's Affidavit [#53-6]. And Mr. Respass avers that (a) Mr. Elam was promoted within the HR Department in February 2017; (b) Mr. Job was promoted in December 2016 from a position within the HR Department to a position in the Safety Department; (c) Mr. Cribbs was promoted within the Maintenance Department in 2013; (d) Mr. Standen was promoted within the Breakdown Department in 2016; and (e) Mr. Silvas was promoted within the Breakdown Department in 2016. [#53-16 at ¶¶ 12–17]. But Plaintiff fails to present any evidence concerning the job duties or

responsibilities of the five alleged "gap" comparators, *see* [#59; #63], and admits that she identified

only Messrs. Wiita and Thacker as JBS employees with similar job functions to her own, [UMF ¶

51].

Thus, Plaintiff has failed to demonstrate that her job was "similar to" the jobs held by any

of her alleged comparators.  Accordingly, Plaintiff has failed to meet her burden at the prima facie

stage of the inquiry; no reasonable jury could find, on the record currently before the court, in

favor of Plaintiff on her wage-based discrimination claims.  Thus, summary judgment is warranted

in favor of Defendant on Claims I and VI.  I turn next to consider whether Plaintiff has met her

burden as to her sex discrimination claims on the basis of discriminatory pay practices.

### B.    Discriminatory Pay Practices.

To make a prima facie claim for sex discrimination under either Title VII or CADA, a

plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse

employment action; and (3) the adverse action arose in circumstances giving rise to an inference

of discrimination. *Salemi v. Colorado Pub. Employees' Ret. Ass'n*, 176 F. Supp. 3d 1132 (D. Colo.

2016), *aff'd*, 747 F. App'x 675 (10th Cir. 2018).

Because the Parties do not dispute that Plaintiff is a member of a protected class, I first

consider whether Plaintiff has established that she suffered an adverse employment action.  In the

United States Court of Appeals for the Tenth Circuit ("Tenth Circuit"), "[a]n adverse employment

action constitutes a significant change in employment status, such as hiring, firing, failing to

promote, reassignment with significantly different responsibilities, or a decision causing a

significant change in benefits." *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir.

2006). "Although what constitutes an adverse employment action is inherently a fluid and fact-

based consideration, a mere inconvenience or an alteration of job responsibilities will not suffice."

*Id.* at 533.

In her Second Amended Complaint, Plaintiff identifies two allegedly adverse actions underlying her sex discrimination claims. *See* [#30 at ¶ 88]. Specifically, she claims that (1) "JBS surreptitiously mis-classified [her] as a Safety Assistant Manager, causing [her] to be compensated at a lower level than she would otherwise be entitled to as a Risk Manager"; and (2) "JBS started [her] at a salary below the minimum salary of the alleged 'Safety Assistant Manager' position." [*Id.*]. Plaintiff alleges that, as a result of JBS's allegedly discriminatory pay practices, male colleagues "similarly-situated" to Ms. Schaeffer received promotions similar to hers but "were not subjected to any limit in pay based upon 'the gap,'" and received benefits including proper job classification, starting salaries at or above the presumptive minimum salary for their respective positions, and substantial increases in pay. [#30 at ¶¶ 89, 127].[7]

The crux of Defendant's challenge to Plaintiff's sex discrimination claims is a lack of evidence to support the inference of discrimination. "Common circumstances giving rise to an inference of unlawful discrimination, as required to support a Title VII discrimination claim, include the hiring of someone not in the protected class as a replacement, or the more favorable treatment of similarly situated colleagues outside the relevant class." *May v. PNC Bank*, 434 F. Supp. 3d 284, 296 (E.D. Penn. 2020). The Tenth Circuit permits a plaintiff to establish an inference of discrimination by demonstrating that he or she was treated differently than similarly-situated coworkers not within the plaintiff's protected class. *See Clincy v. Transunion LLC*, 684 F. App'x 680, 684 (10th Cir. 2017).

*Surreptitious Misclassification.* Even viewing the record in the light most favorable to Ms.

---

[7] To the extent that Ms. Schaeffer also argues implicitly that she was subjected to an adverse employment action by way of constructive discharge, this court finds her argument unavailing for the same reasons set forth in Section III, *infra*.

Schaeffer and assuming that she was misclassified as a Safety Assistant Manager instead of a Risk Manager, she adduces insufficient factual evidence to give rise to an inference of sex discrimination.  It is undisputed that she and Ms. Lindsey shared the same duties and Ms. Lindsey, who is also within her protected class, was paid more than Ms. Schaeffer.  [UMF ¶¶ 4–8, 12–13].  Mr. Respass, the individual responsible for her promotion, provides no evidence that she was intentionally misclassified.  [#53-6].  Similarly, the contemporaneous Personnel Change Form does not suggest that Ms. Schaeffer was somehow misclassified.  [#53-7].  Without more, Ms. Schaeffer cannot carry her burden of establishing a prima facie case of sex discrimination based on the theory of surreptitious misclassification.

*Initial Salary.*  Defendant argues that there is no evidence to support the inference that Plaintiff's sex was a motivating factor in Mr. Respass's setting of her salary in 2014. [#53 at 22–23].  Plaintiff identifies five male employees as alleged comparators that she claims were promoted and provided salaries within their presumptive pay ranges, notwithstanding significant gaps between their pre- and post-promotion salaries. [UMF ¶ 64].  But as discussed above, Plaintiff has not offered any supporting evidence from which the court could infer that these employees were "similarly situated" to her.  Mr. Respass avers that he set Plaintiff's salary in 2014, and that he did so based on budgetary concerns within the Safety Department. [*Id.* at ¶¶ 11, 14].  None of the alleged comparators were promoted (a) the same year as Plaintiff; (b) within the Safety Department like Plaintiff was (the only alleged comparator within the Safety Department was Mr. Job, but he was promoted from a position in the HR Department to his position as Safety Director); or (c) by Mr. Respass. [*Id.* at ¶ 65].  As Defendant points out, there is no evidence in the record to suggest that Mr. Respass was involved in the decision-making for, or the setting of, any of the alleged comparators' salaries.  *See Payan v. United Parcel Serv.*, 792 F. App'x 634, 646 (10th Cir. 2019)

(noting that to be "similarly situated" to the plaintiff, comparator must share the same decision maker).

In addition, none of the five alleged comparators were promoted in 2014, and only one of the comparators was in the same department as Plaintiff at any time pre- or post-promotion. [UMF ¶ 65]. *See Alsip v. Charter Commc'ns, Inc.*, No. 19-cv-01350-MEH, 2020 WL 5107301, at *10 (D. Colo. Aug. 31, 2020) ("Typically, a 'similarly situated' employee shares the same supervisor, is subject to the same performance standards, and faces comparable 'relevant employment circumstances.'") (citing *Green v. New Mexico*, 420 F.3d 1189, 1194 (10th Cir. 2005)). And unlike Plaintiff, who was promoted from within the Safety Department, the single male comparator identified within the Safety Department was promoted to a position therein from a different department. [UMF ¶ 65; #53-16 at ¶¶ 13–18].

Plaintiff thus fails to present any evidence from which this court could infer that any of her alleged comparators were "similarly situated" to Plaintiff. Accordingly, in the absence of evidence to support an inference of discrimination, Plaintiff fails to establish her prima facie case of discrimination. JBS is therefore entitled to summary judgment on Claims II and VII. I turn next to consider Plaintiff's retaliation claims under Title VII, CADA, and the EPA.

## III. Retaliation Under Title VII, CADA, and the EPA.

To establish a prima facie case of retaliation under Title VII, CADA, or the EPA, a plaintiff must establish either directly or indirectly that retaliation played a part in the employer's allegedly adverse action. *See Alsip*, 2020 WL 5107301, at *7; *Fye v. Oklahoma Corp. Comm'cn*, 516 F.3d 1217, 1224–25 (10th Cir. 2008). To prove a prima facie retaliation claim indirectly, Plaintiff must show (1) that she engaged in protected opposition to discrimination; (2) that she suffered adverse action that a reasonable employee would find material; and (3) a causal nexus between her

protected opposition and her employer's adverse action. *Tabor*, 703 F.3d at 1219; *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1215, 1219 n.11 (10th Cir. 2010) (noting that CADA retaliation claims are subject to the same legal standards as Title VII retaliation claims); *Lopez v. Suncor Energy (U.S.A.) Inc.*, No. 11-cv-00081-LTB-BNB, 2011 WL 3799057, at *7 (D. Colo. Aug. 29, 2011) (identifying the same legal standard in the Equal Pay Act context). If a plaintiff makes a prima facie showing, the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for the adverse action. *See Fye*, 516 F.3d at 1227. If the defendant meets its burden, the burden shifts back to the plaintiff to demonstrate that the employer's proffered nondiscriminatory reason for the adverse action is pretextual. *Id.*

   ***Materially adverse action.*** The Parties do not dispute that Plaintiff engaged in protected activity. Accordingly, I first consider whether Plaintiff has adequately established that she suffered an adverse action. In the retaliation claim context, an employer's action is adverse for purposes of a retaliation claim if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (quotation marks and citation omitted). The Supreme Court modified the standard for the second element of a prima facie retaliation claim under Title VII in *Burlington Northern*. *See generally id.* As construed by the Tenth Circuit,

> [n]o longer must a plaintiff provide that subsequent "adverse employment action" was taken against her, as that phrase has been construed in Title VII discrimination cases. Rather the plaintiff must show that a reasonable employee would have found the action materially adverse such that they might be dissuaded from making a charge of discrimination.

*Somoza v. Univ. of Denver*, 513 F.3d 1206, 1213 (10th Cir. 2008) (citing *Burlington Northern*, 548 U.S. 53)). "For conduct to be materially adverse, it must have produced an injury of harm, but unlike in Title VII discrimination cases, the injury or harm in a retaliation claim need not be employment related." *Id.* at 1212. *See also Nazinitsky v. Integris Baptist Med. Ctr., Inc.*, No. CV-

10-043-R, 2020 WL 1957914, at *12 (W.D. Okla. Apr. 23, 2020) (same).

Defendant identifies four adverse actions alleged by Plaintiff: (1) Mr. Job's hostility as demonstrated by his statement that accident or workers' compensation claims as they developed were "not up for discussion" with Plaintiff; (2) Mr. McQuade's conduct in assuming information collection responsibilities related to discovery request responses; (3) Plaintiff's Final Written Warning; and (4) Plaintiff's "forced" resignation. [#53 at 18].  According to Defendant, the only possible "materially" adverse action among the foregoing alleged actions is Plaintiff's Final Written Warning.  [*Id.*].

Specifically, Defendant argues that (1) Mr. Job's hostile attitude toward Plaintiff is not adverse as a matter of law because at most, Plaintiff alleges that Mr. Job occasionally "gave her the cold shoulder or snubbed her," [#53 at 18 ("Plaintiff argues . . . that, shortly after she first complained of discrimination, [her director and a colleague] gave her the 'cold shoulder,' . . . became too busy to answer her questions, and generally tried to avoid her . . . . these alleged snubs . . . are insufficient to support a claim of retaliation. . . .") (citing *Johnson*, 594 F.3d at 1216)]; (2) Mr. McQuade taking over responsibility for one of Plaintiff's tasks does not amount to adverse action, [*id.* (citing *Juarez v. Utah*, 263 F. App'x 726, 737 (10th Cir. 2008) (one minor, immaterial change in a plaintiff's duties is not enough to amount to adverse action))]; and (3) Plaintiff cannot show that her "forced" resignation was materially adverse because she was not constructively discharged, [*id.* (citing *Bolden v. PRC, Inc.*, 43 F.3d 545, 552 (10th Cir. 1994)].

In Response, Plaintiff argues that there is a factual dispute as the materiality of her Final Written Warning because she did not think her email was insubordinate; she honestly believed including Messrs. Job and McQuade and their superiors in the email was appropriate; and when Mr. Job told her that the Final Written Warning was not up for discussion, "she felt she had no

choice but to resign." [#59 at 11–12].  Setting aside the fact that Plaintiff's subjective beliefs are not determinative here, the record evidence belies Plaintiff's position.

Plaintiff alleges that she was "forced to quit" because of the alleged pay disparity and Messrs. Job and McQuade's "increasing" hostility toward her in the summer of 2017.  Despite Plaintiff's allegations that she endured "a pattern of harassment" [*id.* at 12] due to various instances of incivility, rudeness, and hostility from Mr. Job and Mr. McQuade, her own testimony belies that conclusion.  Plaintiff identified multiple occasions prior to June 2017 in which she alleges Mr. McQuade exhibited hostile behavior toward her.  *See* [#60-2 at 190:4–199:23].  Indeed, Ms. Schaeffer testified that she believed Mr. McQuade "didn't like [her] and wanted [her] gone" by January or February 2017—months before Ms. Schaeffer engaged in protected opposition to discrimination.  *See* [#60-2 at 199:10–21 (Q: "And you believe Mr. McQuade was treating you differently because you had raised concerns about pay disparity; is that correct?" A: "No, I – I think towards the end he was, but I think it got to the point where he just didn't like me and wanted me gone." Q: "So by January or February of 2017, you think he didn't like you and wanted you gone?" A: "Yes" Q: "And had that nothing to do with any concerns about the way you were being paid?" A: "No, no – I don't think it did at that point.")].  Ms. Schaeffer identified a single instance of alleged hostility by Mr. McQuade to occur after her protected complaints in June 2017.  *See* [*id.*].  Specifically, while she "was usually provided the information that [she] needed" to respond to interrogatories from attorneys regarding accidents or injuries, "Mr. McQuade began telling [her] that he would send the requested information directly to the requesting party." [#53-5 at ¶ 17; #60-3].

Plaintiff claims in her Response that her supervisors "ganged up on her" in meetings throughout the summer of 2017 and "frustrate[d]" her work.  [#59 at 11].  As support, Plaintiff

cites to her affidavit, [#59-1], wherein she avers that both Mr. Job and Mr. McQuade "were increasingly rude and hostile toward" her after she asked Mr. Job about her pay, and that Mr. McQuade "frustrated [her] work by excluding [her] from meetings and emails, and by blocking access to information [she] needed to do [her] job starting in the summer of 2017." [#59 at ¶¶ 24, 25; #59 at 11].   These allegations are insufficient to create a genuine issue of material fact to preclude summary judgment for at least three reasons.   First, Plaintiff never disclosed these additional allegations of retaliatory conduct (i.e., excluding her from meetings and blocking her ability to access information) by Mr. McQuade in her written interrogatory responses or in her deposition—these allegations and argument thereon appear for the first time in her Response to the Motion for Summary Judgment and her accompanying affidavit. *See* [#60 at 9–10].   Although Defendant's challenges to Plaintiff's additional allegations here are not framed as a violation of her discovery obligations, Federal Rule of Civil Procedure 37(c)(1) provides that a party's failure to disclose information in response to discovery requests thereby precludes that party from using the undisclosed information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. *See* Fed. R. Civ. P. 37(c)(1).

Even if Plaintiff had timely disclosed and properly supported these additional allegations of retaliatory conduct, and in the light most favorable to Ms. Schaeffer, these incidents do not amount to adverse employment actions.   The Tenth Circuit has clearly held that "unsubstantiated oral reprimands and unnecessary derogatory comments" are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status. *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 533 (10th Cir. 1998); *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847 (10th Cir. 2000) (no adverse action where plaintiff encountered "chilly response" and a transfer was suggested).   Ms. Schaeffer "has not identified any evidence showing

how these actions actually interfered with [her] ability to do [her] job, which is probative of whether the [action] was serious enough to dissuade a reasonable worker" from engaging in protected activity. *See Sotunde v. Safeway, Inc.*, 716 . App'x 758, 768 (10th Cir. 2017) (internal quotation and citation omitted) (affirming grant of summary judgment to defendant employer on the plaintiff's retaliation claims).

As further "evidence" of a pattern of hostile conduct at JBS, Plaintiff contends that on September 6, 2017, her supervisors "undermined [her] expertise in worker's [sic] compensation" by making a decision "despite her input." [#59 at 11]. Having effectively been "cut out of the prior decision," Plaintiff nevertheless revisited the decision by sending an email to her supervisors' superiors on September 21, 2017, "again weighing in with her expertise." [*Id.*]. Based on the record before it, a factfinder would have insufficient evidence to conclude that any of the foregoing incidents of common workplace conduct constitute materially adverse actions for purposes of Title VII. *See Somoza*, 513 F.3d at 1215–16 ("[S]ubjective injuries, like a bruised ego, allegedly sustained by [the plaintiff] do not rise to the level of dissuading a reasonable worker from making or supporting a charge of discrimination."); *Felix v. City & Cty. of Denver*, 729 F. Supp. 2d 1243, 1257 (D. Colo. 2010), *opinion adhered to on reconsideration*, No. 08-CV-02228-MSK-KMT, 2011 WL 1085766 (D. Colo. Mar. 24, 2011), and *aff'd*, 450 F. App'x 702 (10th Cir. 2011) (explaining that work-related criticism that was not "particularly insulting or irrelevant" could not constitute an adverse employment action for a retaliation claim); *Duncan v. City & Cty. of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005) ("angry outburst" of co-worker and "general ostracization by other officers" did not support retaliation claim); *Petersen v. Utah Dept. of Corr.*, 301 F.3d 1182, 1190 (10th Cir. 2002) ("ridicule . . . by fellow workers" did not support retaliation claim); *Somoza*, 513 F.3d at 1215 n.2 (noting that Tenth Circuit cases decided prior to *Burlington Northern*

nevertheless "appear consistent with that case's adherence to the principle that mere rudeness is not ordinarily actionable"); *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005) (stating that courts "should filter out complaints attacking the ordinary tribulations of the workplace"), *abrogated on other grounds by Lincoln v. BNSF Railway Co.*, 900 F.3d 1166 (10th Cir. 2018).  And the court notes that Plaintiff's resignation letter, as last modified on September 21, 2017, made no mention of pay disparities or hostility. *See* [UMF ¶ 44].

   ***Whether the alleged actions, in the aggregate, amount to a materially adverse action.*** The court notes that the prima facie case for a retaliation claim, as cited by both Parties and set forth above, is the standard typically applied to discrete acts of retaliation.  Here, however, Plaintiff alleges "a pattern of hostility" that "continued to escalate," [#30 at ¶¶ 96, 111, 135], and states in her Response that "[a] reasonable person would have been deterred from exercising their right to complain when their employer engaged in a pattern of harassment that shortly ended in termination," [#59 at 12].  And much of the language used in Plaintiff's Second Amended Complaint and Response suggests, implicitly, a claim more properly characterized as a retaliatory hostile work environment claim. *See, e.g.*, [#30 at ¶¶ 96, 111, 135; #59 at 12 (referring to "pattern of harassment")].

   As discussed above, the complained-of retaliatory conduct must be sufficiently severe to qualify as a materially adverse action under Title VII.  The Tenth Circuit has held that, even where individual incidents are insufficient alone to constitute material adverse action, the aggregation of such actions may rise to the requisite level of materiality and adversity.  *See Somoza*, 513 F.3d at 1219; *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004).  A retaliatory hostile work environment may constitute a materially adverse action but, to succeed on a retaliation claim based on a hostile work environment, "the behavior complained of must render the workplace permeated

with [retaliatory] intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *McGowan v. City of Eufala*, 472 F.3d 736, 743 (10th Cir. 2006). *See also Sotunde*, 716 F. App'x at 765; *Lafont v. Colorado Athletic Club*, No. 13-cv-02345-MSK-CBS, 2015 WL 5031981, at *8 (D. Colo. Aug. 26, 2015) (granting summary judgment in employer's favor where former employee's evidence of harassment was insufficient to establish a materially adverse action for purposes of a retaliatory hostile work environment claim).

Even aggregated, this court finds that the few isolated incidents of which Ms. Schaeffer complains do not constitute a sufficiently pervasive hostile work environment.   *See Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).   As discussed above, Ms. Schaeffer identifies only one incident of hostility from Mr. McQuade occurring after she raised concerns regarding her pay as compared to men.   Similarly, mere inconveniences or alterations of job responsibilities do not constitute adverse employment actions.  *Stover*, 382 F.3d at 1075.  Viewing the exchange about the worker's compensation issue in the light most favorable to Ms. Schaeffer, this court finds that neither Mr. Job nor Mr. McQuade threatened or sought to change any aspect of Ms. Schaeffer's job or the associated responsibilities.   While "[t]here may be circumstances where inconveniences [and] alterations of job responsibilities . . . considered individually are insufficient to demonstrate an adverse employment action, yet when considered together, amount to an adverse employment action," *id.*, there are insufficient facts in the record for Plaintiff to carry her burden of establishing a prima facie case of a hostile work environment based on an aggregation of events.

**Constructive discharge.**  While Plaintiff does not expressly state a claim for constructive discharge against JBS, she testified and contends that she "had no choice but to resign."  [#59 at

11–12]. Defendant argues that Plaintiff cannot establish that she was constructively discharged as a matter of law. [#53 at 18–19]. "Constructive discharge is an adverse employment action." *Strickland v. United Parcel Serv.*, 555 F.3d 1224, 1230, n.4 (10th Cir. 2009); *see also Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 980 (10th Cir. 2008) ("Even if an employee resigns, the plaintiff may still satisfy the adverse employment action requirement by demonstrating that [she] was constructively discharged.").

A claim of constructive discharge has two basic elements. First, the plaintiff must show that she "was [unlawfully] discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign." *Rivero v. Bd. of Regents of Univ. of New Mexico*, 950 F.3d 754, 761 (10th Cir. 2020) (internal citation and quotation omitted). Second, a plaintiff must show that she actually resigned. *Id.* at 761. "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." *Id.* Because facts adduced by Ms. Schaeffer fail to meet the threshold of a material adverse harm, singularly or cumulatively, it follows that those same facts cannot satisfy the higher threshold required for a constructive discharge claim. *See Sotunde*, 716 F. App'x at 769 (internal quotation and citation omitted). Thus, I conclude as a matter of law for the reasons set forth above that Plaintiff cannot establish that she was constructively discharged.

Contrary to Plaintiff's argument, the fact that JBS informed her that the departure was classified as an "involuntary termination" and JBS reported the same to the unemployment division [#59 at 11], does not create a genuine issue of material fact as to constructive discharge. The fact that JBS chose to classify Plaintiff's termination as "involuntary" does not change the lack of evidence in the record regarding the severity or pervasiveness of abuse in the work environment, or the undisputed fact that neither Mr. Job nor Mr. McQuade ever terminated Ms. Schaeffer. [#61

at 7]. *See also* [#60 at 11]. Instead, the record reflects that, in response to Mr. Job's statement that he could not continue her employment if she continued to argue with him, <u>Ms. Schaeffer affirmatively chose</u> to "tune[] him out, look[] at him and sa[y] . . . 'Fine, I'm done!!!' [and] walk[] out . . . ." [UMF ¶ 47].

Accordingly, I find that Plaintiff has failed to establish a materially adverse action to support her prima facie retaliation claims.[8] Summary judgment on Claims III, V, and VIII is **GRANTED** in favor of Defendant.

In sum, for the reasons set forth above, there are no genuine disputes of material fact to

---

[8] Even if Defendant's conduct did rise to an actionable level for purposes of a retaliation claim, Ms. Schaeffer's claims here fail on causation. There is no direct evidence in the record that reflects animus from either Mr. Job or Mr. McQuade arising from her wage complaints. But causation may be inferred if protected activity is closely followed by an adverse employment action. *Foster v. Mt. Coal Co., LLC*, 830 F.3d 1178, 1191 (10th Cir. 2016); *Talbott*, 2020 WL 2043481, at *15 (citing *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013) (finding that a 45-day period between the protected activity and the allegedly retaliatory action supports an inference of causation, while a three-month gap will not). The two months between Ms. Schaeffer's last complaint to Mr. Job about pay disparity in July 2017 [UMF ¶ 34], and her subsequent Final Written Warning on September 26, 2017 [*id.* at ¶ 45], indicates that this case falls within a gray area along the temporal line. *See Meiners v. Univ. of Kansas*, 359 F.3d 1222, 1231 (10th Cir. 2004) (stating that a period of two to three months between plaintiff's protected activity and the alleged retaliation was "probably too far apart . . . to establish causation by temporal proximity alone"); *Conroy*, 707 F.3d at 1181 ("[W]here, along the temporal line beyond one and one-half months but short of three months, the adverse action's timing ceases to be sufficient, standing alone, to establish the requisite causal inference is less than pellucid."). Without more, the uncontroverted evidence establishes that the Final Written Warning was a response to Plaintiff's insubordinate email, which she knew would "get [her] into trouble," and Plaintiff explained to others shortly after receiving her Final Written Warning that her termination was the result of her disagreement with Messrs. Job and McQuade about the workers' compensation issue. [UMF ¶¶ 38–48]. This is reinforced by the evidence indicating in the days following her termination from JBS, Ms. Schaeffer explained to others that the reason for her termination was related to her disagreement with her supervisors about the workers' compensation issue—not her pay disparity complaints from months prior. [*Id.* at ¶ 48]. Accordingly, because JBS issued its Final Written Warning to Plaintiff at least in part for reasons that are not unlawful, this court concludes that Plaintiff has not pointed to a genuine issue of fact regarding the requisite "but-for" causation to succeed on a retaliation claim under Title VII. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (holding that a Title VII retaliation plaintiff must establish but-for causation); *Talbott*, 2020 WL 2043481, at *16.

warrant a trial on any of Plaintiff's eight claims against JBS.  Summary judgment is therefore granted in favor of JBS on Claims I through VIII and Plaintiff's claims are **DISMISSED with prejudice**.  Thus, Plaintiff no longer has an action against Defendant—but JBS's state law counterclaims for conversion, civil theft, and breach of contract remain.  I turn now to consider whether the court has jurisdiction over JBS's counterclaims.

## JBS'S COUNTERCLAIMS AGAINST PLAINTIFF

JBS asserts three counterclaims against Plaintiff for conversion, civil theft, and breach of contract under Colorado law. *See* [#43].  In the instant Motion, JBS seeks summary judgment on all three of its counterclaims.  *See* [#53 at 23–25].  Upon review, the court *sua sponte* considers the issue of its subject matter jurisdiction over these remaining causes of action. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) ("[A]n objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment.") (citation omitted).  For the reasons that follow, this court concludes that it lacks subject matter jurisdiction over JBS's state law counterclaims and thus, does not reach the Parties' substantive arguments on the same.

*Legal Standard.* "[I]t is well established—in certain classes of cases—that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).  In its First Amended Answer to the Second Amended Complaint and Counterclaims, "Defendant affirmatively states that this Court's jurisdiction arises under 28 U.S.C. § 1331 and 28 USC § 1367."[9]  [#43 at ¶ 7].  Pursuant to 28

---

[9] JBS removed this action to federal court on the basis of federal question jurisdiction rather than diversity. [#1 at ¶ 6; #43 at ¶ 7].  Indeed, this court does not have diversity jurisdiction over JBS's counterclaims because all three are asserted between citizens of the same state. [#43 at 20 ¶¶ 1–

U.S.C. § 1367(a), district courts are granted jurisdiction "'over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.'" *Price v. Wolford*, 608 F.3d 698, 702 (10th Cir. 2010) (quoting 28 U.S.C. § 1367).  A claim (or counterclaim) "is part of the same case or controversy if it 'derives from a common nucleus of operative fact.'" *Id.* at 702 (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1997) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966))).  In other words, this court has discretion to exercise supplemental jurisdiction over JBS's counterclaims only if they share a common nucleus of operative fact with Plaintiff's claims over which this court has original jurisdiction.[10]

*Analysis.*  Here, Defendant's state law counterclaims do not derive from the same nucleus of operative fact as Plaintiff's discrimination and retaliation claims.  As discussed above, Plaintiff's EPA and wage-based discrimination claims require evidence that she (a) was performing work substantially equal to higher-paid male employees at JBS under similar

---

2].  Nor is there any indicia that the amount in controversy as to the counterclaims exceeds the jurisdictional threshold of $75,000.  *See generally* [#43 at 20–27].

[10] Prior to the enactment of § 1367 in 1990, the Tenth Circuit looked to whether a counterclaim was compulsory or permissive to determine whether a court had supplemental jurisdiction over the counterclaims.  *See NLRB v. Dutch Boy, Inc.*, 606 F.2d 929, 932 (10th Cir. 1979).  Courts in this District and others have noted that the Tenth Circuit has not yet determined whether this compulsory/permissive distinction still applies post-enactment.  *See, e.g.*, *Taylor v. L&P Building Supply of Las Cruces, Inc.*, No. CIV 14-0989 JB/CG, 2015 WL 7803614, at *11 (D.N.M. Oct. 27, 2015); *Jones v. Addictive Behavioral Change Health Grp., LLC*, 364 F. Supp. 3d 1257, 1263 n.5 (D. Kan. 2019); *Ott v. Chacha in Art LLC*, 18-cv-01135-LTB-GPG, 2019 WL 10252743, at *3 (D. Colo. May 1, 2019).  Here, the Parties do not address whether Defendant asserts compulsory or permissive counterclaims.  The court therefore declines to address this issue and, indeed, does not need to because—under the facts of this case—its jurisdictional analysis would not change under the compulsive/permissive analysis. *See Jones*, 364 F. Supp. 3d at 1263 n.5  (dismissing defendant's breach of contract counterclaim for lack of subject matter jurisdiction and declining to address the compulsory/permissive distinction issue because its jurisdictional analysis under § 1367 would yield same outcome); *Ott*, 2019 WL 10252743, at *3 (finding supplemental jurisdiction over state law counterclaims under a § 1367 analysis and finding Rule 13 and its compulsory/permissive distinction a moot point in that case).

conditions, and (b) occupied a job similar to higher paying jobs occupied by males, respectively; and her retaliation claims turn on whether, after voicing her pay disparity concerns to Messrs. Job and McQuade, she was subjected to adverse action in retaliation for the same.  Necessarily, Plaintiff's wage-based claims turn on facts related to her job responsibilities, salary, and working conditions relative to other JBS employees.  Her retaliation claims turn generally on the series of events, culminating in September 2017, related to Plaintiff's complaints of pay disparities, a dispute between Plaintiff and Messrs. Job and McQuade regarding a workers' compensation issue, Plaintiff's communications regarding that workers' compensation issue, and the presentation of her Final Written Warning.

The counterclaims involve none of these operative facts.  *See* [#43 at 20–27].  Indeed, JBS discovered Plaintiff's alleged misuse of confidential employee information in October 2019—more than two years after Ms. Schaeffer separated from JBS—and did not assert these counterclaims until January 3, 2020.  *See* [#53 at ¶ 49; #53-16 at ¶ 20; #43].  Moreover, JBS's counterclaims for conversion, civil theft, and breach of contract will require distinct evidence demonstrating that, *inter alia*, Plaintiff sent, kept, and/or deleted emails containing confidential employee information from her JBS account to her personal email account without authorization; and the existence, terms, and breach of a contract between the Parties regarding the same emails. *See, e.g.*, *Scott v. Scott*, 428 P.3d 626 (Colo. App. 2018) (conversion); *Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603 (Colo. 2016) (citing Colo. Rev. Stat. § 18-4-401(1)) (civil theft); *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (en banc) (breach of contract).

These operative facts are unrelated to the facts underlying the claims over which this court has original jurisdiction and are insufficient to confer supplemental jurisdiction.  *See Barr v. Diguglielmo*, 348 F. App'x 769, 774 (10th Cir. 2009) (while the issues implicated by the federal

and state claims need not be identical, a "'mere tangential overlap of facts,' . . . is insufficient to confer supplemental jurisdiction") (quoting *Nanavati v. Burdette Tomlin Mem'l Hosp.*, 857 F.2d 96, 105 (3d Cir. 1988)).   Because Plaintiff's (dismissed) claims and Defendant's state law counterclaims lack a common nucleus of operative facts, § 1367(a) does not confer upon this court supplemental jurisdiction over Defendant's state law counterclaims.  *See Ghazal v. Whinery*, 19-cv-00579-JFH-JFJ, 2020 WL 5028788, at *3 (N.D. Okla. Aug. 25, 2020) (concluding that court lacked subject matter jurisdiction over breach of contract claims because plaintiff's federal claim did not derive from a common nucleus of operative fact); *Taylor v. L&P Building Supply of Las Cruces, Inc.*, No. CIV 14-0989 JB/CG, 2015 WL 7803614, at *11 (D.N.M. Oct. 27, 2015) ("Because the underlying claims and the Counterclaim do not share a common nucleus of operative facts, § 1367 does not provide the Court with supplemental jurisdiction to hear the state-law claim.").  *Cf. Ott v. Chacha in Art LLC*, 18-cv-01135-LTB-GPG, 2019 WL 10252743, at *3 (D. Colo. May 1, 2019) (finding that the court had supplemental jurisdiction over employer's breach of fiduciary duty and intentional interference with contractual relationship counterclaims because the same facts undermined employee's retaliation claim).  Accordingly, this court lacks subject matter jurisdiction over the counterclaims in this action.[11]

---

[11] Even if § 1367(a) did confer upon this court supplemental jurisdiction over the counterclaims, the court would still decline to exercise jurisdiction under § 1367(c)(3).  Pursuant to § 1367(c), in deciding whether to exercise supplemental jurisdiction a court should consider whether (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the court has original jurisdiction; (3) the court has dismissed all claims over which it has original jurisdiction; or (4) "in exceptional circumstances," there are other compelling reasons for declining to exercise jurisdiction. *See* 28 U.S.C. § 1367(c).  Here, the court has dismissed all of the claims over which it has original jurisdiction. *See also Ghazal v. Whinery*, 19-cv-00579-JFH-JFJ, 2020 WL 5028788, at *3 (N.D. Okla. Aug. 25, 2020) (concluding that court lacked subject matter jurisdiction over breach of contract claims because plaintiff's federal claim did not derive from a common nucleus of operative fact and noting that, even if it had supplemental jurisdiction, the court would decline to exercise it because the claims "would require different

***Remand to State Court.*** A district court must remand a case if, at any time prior to final judgment, it appears to lack subject matter jurisdiction. *See* 28 U.S.C. § 1447(c). "Without supplemental jurisdiction, federal statutes authorize partial remand of state-law claims only from a civil action where a federal question claim is joined to a state-law claim over which the court lacks subject-matter jurisdiction." *Taylor*, 2015 WL 7803614 at *12 (citing 28 U.S.C. § 1441(c)). *See also Roybal v. City Labor-Mgmt. Relations Bd.*, 2014 WL 12787960, at *4 (D.N.M. May 29, 2014) (remanding state law counterclaims after dismissing plaintiffs' claims where federal question, rather than diversity, was the asserted basis for removal). Because this court lacks supplemental jurisdiction over JBS's counterclaims, and because this case was removed on the basis of federal question jurisdiction and only JBS's state law counterclaims remain, this court finds remand appropriate as to the remaining claims in this action. Accordingly, JBS's counterclaims for civil theft, conversion, and breach of contract are **REMANDED** to the District Court for Weld County.

## CONCLUSION

In applying the applicable legal standards to the undisputed material facts in the record, this court concludes after considering each of Plaintiff's claims that there is no genuine issue of material fact to warrant a trial on any of her claims against JBS in this matter. In addition, I find that this court lacks subject matter jurisdiction over JBS's state law conversion, civil theft, and breach of contract counterclaims and thus remand the counterclaims to the District Court for Weld County. Accordingly, Defendant's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

---

evidence and likely different witnesses" and "trial of the claims together would only complicate the proceedings").

For the reasons stated herein, **IT IS ORDERED** that:

(1)     Defendant's Motion for Summary Judgment [#53] is **GRANTED IN PART AND DENIED IN PART**;

(2)     Summary judgment shall enter in **FAVOR** of JBS and **AGAINST** Ms. Schaeffer on all of Plaintiff's claims, and Plaintiff's claims are **DISMISSED with prejudice**;

(3)     Final Judgment shall enter in **FAVOR** of JBS and **AGAINST** Ms. Schaeffer on each of Plaintiff's claims;

(4)     Defendant, as the prevailing party, shall be awarded its costs pursuant to Rule 54(d)(1) of the Federal Rules of Civil Procedure and D.C.COLO.LCivR 54.1; and

(5)     Defendant's counterclaims for conversion, civil theft, and breach of contract are **REMANDED** to the District Court for Weld County, Colorado, Case Number 2019CV30216.

DATED:  December 1, 2020                    BY THE COURT:

                                            Nina Y. Wang
                                            United States Magistrate Judge